JOHN H. POPE *v.* H. O. ANDERSON—D. KINNEY et al., Warrantors.

Where a sale was made to three persons, and to the survivor of them, and two of the vendees having died, the survivor claimed the ownership—*Held :* That there being no forced heirs of the deceased owners and no creditors having an adverse interest, the title vested in the survivor.

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J. *Wapples & Eustis*, for plaintiff and appellant :

The plaintiff claims a slave, relying upon a title given by *R. W. Long* to " *W. C. Pope* and *Eliza Pope*, his wife, and to *John Haggerty*, their adopted child and the survivor of them, in consideration of $350 to him paid by *William C. Pope* and *Eliza Pope.*" It is stipulated in the deed, that " if the said *John Haggerty* (who is now an infant of about the age of two years) should happen to die, or be taken away by his relations, or go away from the said *William C. Pope* and *Eliza Pope*, his wife, at any time before the decease of the survivor of them, the said *William C. Pope* and *Eliza Pope*, then, in such case, the said slave *Absolom* is to go to the survivor of them, the said *William C.* and *Eliza Pope*, and the heirs of such survivor."

1. By this contract the plaintiff became joint owner of the slave, having one-third interest. *John Haggerty* is proved to be identical with the plaintiff, *John H. Pope*. *William C. Pope* signed the deed " for self and *John Haggerty*," and must be presumed to have paid for both, and with the money of both, since the plaintiff was but two years old, physically incapable of the act of payment. *William C. Pope* avers in the notarial deed of sale, that plaintiff is his adopted son. " The purchase of property by the father in the name of his children is valid." *Hopkins* v. *Buck*, 5 Ann. 487. Purchase, in the name of an adopted child can form no exception. Whether the purchase be in the name of his offspring, his adopted son or his ward, the intermediary is but an agent, through whom the minor makes the contract and pays the price.

Considered as a stipulation in favor of plaintiff, as a third person, the title is good. Parsons on Contracts, page 388 ; Story on Contracts. The instrument is valid as a deed of gift. *Holmes* v. *Patterson*, 5 Mart. 693. It was made before a notary and two witnesses, and there can be no other nullity of form. *Solieu* v. *Rougeau*, 2 An. 766. No formal acceptance was requisite. Art. C. C. 1533 is not prohibitory, and not followed by the penalty of nullity if contravened. *Duplesis* v. *Kennedy*, 6 La. 245. The words " present and accepting" in the deed, were sufficient, without the signature of the infant, who was incapable of signing, and he may now adopt the signature of his name as made by *Wm. C. Pope*, who assumes the act as his agent. Vide 6 La. 245 ; Institutes, b. 1, tit. 21 ; Digest, b. 26, tit. 8, l. 9 ; *Gomez*, variæ Res. chap. 4, de Donatione ; Partida 6, tit. 16, l. 17,

The proposition established, it follows as a corollary that plaintiff had immediate possession ; for " possession follows title." It follows also that he received the usufruct, for this the law presumes. C. C. 2256 ; 17 La. 366.

II. *The three joint owners agreed that the survivor should become sole owner : the plaintiff is the survivor.*

The *jus accrescendi* of the common law is not incorporated into our jurisprudence, but it may be created by contract, if it work no injury to third persons. *Wm.* and *Eliza Pope* are proved to have had no forced heirs. The law presumes them

to have had no creditors. The contract of survivorship was based upon valid consideration. The three joint owners were seized *per my et per tout.* The contract was reciprocal; each party agreeing that the survivor should become sole owner, in consideration of becoming sole owner himself, should he be the survivor. The right to the whole, should he be the survivor, was not *to be* acquired, but was then complete. By the terms of this contract, the plaintiff could not become sole owner till the death of his co-contractors; but this did not make the instrument on which we sue a donation *mortis causa.* This contract could not have been revoked by *William* and *Eliza Pope:* a donation *mortis causa* might have been. The condition of survivorship was a valid condition. Toulier, lib. III, tit. II. Donations and Testaments, sec. 277 and 307, p. 295. The condition of survivorship, so common between husband and wife in donations *inter vivos,* is allowed between strangers. The similarity to the donation *mortis causa* is destroyed by reason of the irrevocability of the donation. The fulfillment of the condition has a retroactive effect to the date of the contract. Each of the contractors is estopped from disposing of the thing, to the prejudice of his fellow contractors. See Article Tontine in Merlin Répertoire de Jurisprudence, vol. 34, p. 335; *Succession of De Bellisle,* 10 A. 478.

The penalty of the contract was not incurred by plaintiff, for he remained with *William* and *Eliza Pope* till their death. If not a penalty, it was a condition; if a condition, it has been complied with. Immediate delivery was not necessary, even if this title be considered an act of donation, as between the *Popes* and plaintiff. It was an *onerous* donation. 5 M. 694; Toulier, 6, p. 652; C. C. 1510, 1513, 1515, 1940, 2032, 1553.

*W. H. Hunt,* for *David Kinney,* warrantor:

In construing this contract, regard must be had to all the provisions of the entire instrument, and not to any one by itself. C. C. 1943. Thus, the clause which purports to sell the slave " to *W. C. Pope* and *Eliza H. Pope,* and to *John Haggerty,* their adopted child, and to the survivor of them," ought not, according to the elementary principles of interpretation, to be viewed as conferring on the plaintiff an absolute and immediate property in the slave, but must be construed with the whole context and with reference to the important modification of the plaintiff's rights which the act proceeds to particularize in its subsequent clauses already quoted.

These, then, were the rights acquired by *John Haggerty* under this anomalous act. If he die before *Mr.* and *Mrs. Pope,* his heirs could not succeed to any property in this slave, but the property fell to *Mr.* and *Mrs. Pope* or their heirs. If he went or was taken away from *Mr.* and *Mrs. Pope* during their life, the slave belonged to them and their heirs. In the event of the occurrence of either of these contingencies, he had no right whatever in the slave. But, if he survived both *Mr.* and *Mrs. Pope,* and had continued to live with the survivor of them up to the time of the death of such survivor, he was to become then, and for the first time, the owner of the slave. In other words, the act so far as it relates to the plaintiff, contains a donation *in futuro,* dependent on the plaintiff's surviving both the donors and his continuing to live with them. It vested in the minor no present property whatever in the slave. To interpret the act as doing so becomes irreconcilable with the provisions by which, if he died or left the donors, his right of property inured to their advantage unconditionally. The donors certainly could not thus have intended to stipulate. If they gave to the minor by that instrument an immediate undivided interest in the slave, which interest was to revert to them or either of them in the event of his death, they created a substitution, which was an absolute nullity. They had no right to dispose of the minor's property after his death; and unless the act cannot be understood otherwise, it will not be interpreted as intended to contravene the law. *Cole* v. *Cole,* 7 N. S. 417; Hen. Dig. p. 432, No. 5. Nor can they, with any greater reason, be supposed to have intended to confer an absolute right of property on the minor, and then if he left them to have at once appropriated it to themselves. It is far more consonant with law and reason to believe that, in view of their being unable to create a substitution, these parties did not intend to create one; that, in view of the modifications of the right of property in Louisiana, which are so simple and so few, they did not intend to make to the object of their bounty, a contract hampered with unusual and complicated conditions, alike subversive of his full right of ownership during his life, and of his right of transmitting it to his heirs after

his death; and that instead of entering into "a reciprocal contract" with a child two years of age, by which "each agreed that that the survivor should become sole owner in consideration of the chance that he might be the survivor," *Pope* and his wife intended rather to present the negro to the child, at their death, provided he had not runaway from them, as foundlings so frequently do from their benefactors.

This is the plain and obvious meaning of the clauses of this contract. This is the full extent of right sought to be conveyed to the minor under them. Viewed in this light, it is clear that the act contains a donation *inter vivos* of the slave in question to the plaintiff, reserving to the donors during their life-time the usufruct of the property.

That the *Popes* continued always to enjoy this slave during their lives, is distinctly proved by the evidence of *Mrs. Zollers* and of *Mrs. Aspen*, to be found in the record. They both further say that the plaintiff never was in possession of the slave. The usufruct, hence, never was in the plaintiff. The owners, *Pope* and his wife, retained it always, and never contemplated parting with it, till they died.

If, from what has been already said, the court has any hesitation in arriving at the conclusion that such was the intention of the parties to this act, then I invoke the rule, that "when there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject, between the same parties, before or after the agreement in question." C. C. 1244. And the attention of the court is asked to the nature of the several acts containing gratuities to this plaintiff during his infancy, made by *Mrs. Pope*, within a few years after the date of the act now under consideration. These acts form part of the Record in the suit of *Haggerty* v. *Corri*, which has been introduced in evidence in this case. In that suit, the present plaintiff sued to recover a slave, and based his claim upon titles from *Mrs. Pope*, so similar in features to the act before the court, that they may well be consulted, as having been prompted by the same motives, and intended to accomplish the same results, by the same means. The first of these titles referred to, purported to be a sale by *Mrs. Pope* to *John Haggerty*, of a slave. Its true character, however, having been judicially determined, the opinion of the District Judge, which was, without any change, adopted by Chief Justice Eustis, as the opinion of this court, best explains it. The court says: "The title which the date contained in the petition implies, is found in a document dated 28th May, 1837, a deed from *Eliza H. Pope* to *John Haggerty*. Is this deed a sale or a donation? It purports, in its terms, to be a sale. But it cannot be a sale, for there is no price. The consideration expressed 'is the love and affection' which *Mrs. Pope* bore to the plaintiff. As a donation, it is bad, because *Mrs. Pope* therein reserves to herself the usufruct of the slave *George* during her natural life." 5 An. 433. The other title, under which the plaintiff also claimed in that suit, is of a like nature, being a donation *inter vivos*, in the form of a sale.

That *Mrs. Pope* herself regarded the act now before the court in the light in which it is here presented, is evident from the recitals contained in an instrument which the plaintiff has introduced in evidence, and which will again be referred to. From these recitals, it appears that *Mrs. Pope*, when about to contract a second marriage with *Corri*, had made a donation of the very slave now in controversy, together with others, to her intended husband. This is a practical interpretation by her of the act before the court. It shows that she alone held the slaves after her first husband's death, and dealt with them as though they were hers only. It is subversive of the plaintiff's hypothesis, that, under the act, he had acquired any undivided interest in the slave *Absolom*, during the lives of Mr. and Mrs. *Pope*, and it shows that she considered herself in the possession of the usufruct.

Upon the whole, when it is considered that *R. W. Long*, the vendor in the act of sale of this slave, is shown to have had no interest in, or connection with, the minor, *John Haggerty*, and hence could have had no motive to stipulate in his favor; that, on the other hand, *Mr. and Mrs. Pope* speak of him as their adopted child, and look forward to his living with them until their death, and manifest an affection for him, and a desire to confer a benefit on him; that they pay for this slave, whom they contemplate owning for the rest of their lives; that they put upon record, in the act, the legal and physical incapacity of the minor; that they afterwards executed other instruments in his favor, by which they gave him other slaves, at their death, reserving to themselves the usufruct of such slaves during

their own lives; and, when it is further considered that these were simple people, who are fairly to be presumed not to have been versed in the technical niceties of legal science, the "*per my et per tout*" of the common law spoken of in the plaintiff's brief, it cannot be credited that they designed to confer a title so intricate and extraordinary in its character, and, to say the least, of such questionable validity, as that which is presented in the ingenious brief filed by the plaintiff's counsel. Let any man with a candid mind and with the honest desire to arrive at the common intention of the parties, but read the whole act, and he cannot fail to conclude that it intended a conditional gratuity from *Pope* and his wife alone to the plaintiff, and only after their death.

If this conclusion be correct, the title of the plaintiff, as is shown in the case of *Haggerty* v. *Corri*, already quoted, 5 An. *loc. cit.*, is bad. "The donor is permitted to dispose, for the advantage of any other person, of the enjoyment or usufruct of the immovable property given, but cannot reserve it for himself." C. C. 1520. "This is," said the Supreme Court, "a salutary departure from the Napoleon Code, by which a donor was permitted to reserve the usufruct to himself. The change was dictated by sound considerations of public policy. In the language of the jurisconsults who prepared the amendments to our Code of 1808, "the reservation of the usufruct in favor of the donor would produce the disadvantage of concealing from the eyes of the public the change of property which had taken place. He who wishes to enjoy during his life a piece of property which he destines for another, can give it by last will; and it is not easy to perceive the use of a donation *inter vivos*, with reserve of usufruct." *Dawson* v. *Holbert*, 4 An. 37.

It is said that " by this contract the plaintiff became a joint owner of the slave, having one-third interest ; and it is urged, that *W. C. Pope* must be presumed to have paid for both, and with the money of both. This presumption is based upon the declarations that *Pope* signs the act " for self and *John Haggerty*," and that the " plaintiff was but two years old—physically incapable of the act of payment." It is submitted that this incapacity of the plaintiff does not warrant any such deduction. There is no reason for presuming that a person, because he is physically incapable of making a payment, must therefore possess the pecuniary means of doing so. Minority and money are not correlative terms. Nor is the plaintiff's case strengthened by the mere fact that *W. C. Pope* signed the act for " self and *John Haggerty* ; " since the act itself recites that the consideration is paid alone by *W. C. Pope* and *Eliza*, his wife, and does not say that it is paid by or for the minor. The presumption then is, that the money they paid was their own money, and not that of another.

And this presumption receives additional weight, when it is considered that the evidence shows the plaintiff was a foundling without means, whom *Mr.* and *Mrs. Pope* took to rear through charity.

But, if this was the minor's money then paid, how comes it that the parties to the act, *Mr.* and *Mrs. Pope*, undertake to divest him of the title *his* money must have bought, if he happen to die or be taken away, or go away from them at any time before the decease of the survivor of them ? They could not so have stipulated for him, had the money they paid belonged to any one but themselves. This provision in the act is altogether repugnant to the idea that the money paid was that of the minor.

By the Roman law, there were six modes of disposing gratuitously of property. The Napoleon Code has entirely abrogated the complicated system of the Roman law, and has substituted a system of the greatest simplicity. " Il n'y a maintenant en France que deux modes de dispositions gratuites : un seul s'accomplissant *voluntate viventium*, la donation entrevifs ; un seul *voluntate morientium* le legs. Il n'y a également que deux formes pour les constater ; la donation se fait par un acte qui porte le même nom qu'elle ; le legs se fait uniquement par testament." Marcadé, Explic. du C. C., Art. 893, No. 437.

The jurisprudence of Louisiana conforms precisely with that of France ; and the Article 1453 of the Civil Code, which provides " that property can neither be acquired nor disposed of gratuitously, unless by donations *inter vivos* or *mortis causa*, made in the forms hereafter established for one or the other of these acts," is but a translation of Article 894 of the Napoleon Code.

If, then, the pretensions of this plaintiff were acquired as a gratuity conferred upon him, they could only ripen into rights when acquired in one of the two modes which the Code points out, and according to those sacramental forms which it

POPE
v.
ANDERSON.

enjoins. These forms, from sound considerations of public policy, which it is unnecessary here to repeat, but which gave rise to the restriction in Art. 1453 of our Code, are matter of substance in contracts of donation *inter vivos*.

The appellant, foreseeing this fatal difficulty, in one part of his brief attempts to meet it; and, whilst he concedes that the title under which he claims is a donation *inter vivos*, calls it an onerous donation, which is not subject to the solemn forms that govern donations *inter vivos*.

This attempt is futile. The condition which the notarial act contains cannot be reasonably tortured into the imposition of a burthen on the donee. Its true object evidently was, to confer a benefit, not impose a burthen, on the plaintiff. It only enhances the gratuitous character of the donation, and serves to make it more a liberality than ever, as was shown in the argument at bar. But, even were this not the case, it could not with propriety be deemed to lose its character as a gratuity. " La donation ne perdrait pas son caractère d'acte gratuit, parce qu'elle imposerait quelques charges au donataire (pourvu, bien entendu, que ces charges ne fussent pas l'équivalent de l'objet donné); ce serait alors une donation onéreuse pour partie, mais qui resterait donation, du moment que, toute compensation faite, elle présente toujours une libéralité. * * * Du moment que le disposant n'est pas payé, son acte est donc une libéralité, une donation. Telle est bien aussi la pensée de la loi, qui, dans l'article 945, parle de donations faites sous la condition d'acquitter les dettes et charges du donateur." 3 Marcadé, Explic. du Code Civil, Art. 894, No. 442.

It results, therefore, that the instrument under consideration does not, from these clauses, lose its character as a donation *inter vivos*, and become exempt from the penalty of the non-observance of those important forms, without which such a contract cannot exist and have effect.

The act then being a donation *inter vivos*, of a slave, is absolutely null and void, as a title to such slave, on several grounds. The donee was not a party to it. It never was accepted by him in precise terms. It never was registered. C. C., Arts. 1523, 1527, 1530, 1537 and 1545; 3 Marcadé, Nos. 632 and 633 et seq.; Rogron, Com., Art. 932, C. N.; 3 Troplong, Don. et Test., Nos. 1087 and 1093; 5 Zachariæ, Sec. 652, No. 4. 1 Biret., Traité de nullités, ch. xix, p. 256; 6 Rob. 329. *Packwood* v. *Dorsey*.

The case of *Holmes* v. *Patterson*, on which the appellant relies so strongly, evidently refers to a title created at common law. The authorities quoted by the Judge show this : the terms employed in describing it, characterize it as " a deed of gift," a kind of title known only at common law. Besides, the validity of the title is, in that case, declared in virtue of the Spanish law, which at that time was still of force in Louisiana. Again too, the minor must have been a party to the pretended sale, and hence must have signed it.

The case of *Duplessis* v. *Kennedy*, which the plaintiff makes so much of, simply declares that the want of acceptance of a donation *inter vivos* by a curator of a minor above the age of puberty, is a relative and not an absolute nullity. The contrary doctrine, in spite of this single decision of the Supreme Court, might still be urged, since such is the opinion held by very many of the ablest French writers. But the opinion of the more recent commentators seems to sanction the interpretation of our own court. The form of the act, say they, is not to be confounded with the capacity of the parties. The Articles in the Code only designate the persons who can make a valid acceptance, not those who can make " une acceptation quelconque." The incapacity of the person accepting a donation, is a relative nullity, of which the donee may avail himself; but the violation of the solemn forms by which alone donations *inter vivos* can exist—the absence of any acceptance by the donee in precise terms—is an absolute nullity, which stamps the instrument as bad. 3 Marcadé, No. 650 et seq.; Zachariæ, ab sup., note. This is as far as the Supreme Court went in the case of *Kennedy*. The donation there was accepted by the donee, and the Court recognize the necessity of an acceptance in precise terms, of all acts of donation *inter vivos*, in order to give them effect. 6 La. 245. And besides, this case was also decided with reference to the Spanish law, which was not repealed until 1828.

Both the cases referred to, then, differ materially from the case at bar. Here the minor did not sign the act, and has never accepted the donation, formally or otherwise. The signing by *Pope*, for self and *John Haggerty*, is no acceptance. Being one of the donors, he was absolutely incapable of accepting—incapacle of contracting with himself. His presuming to call the plaintiff his adopted son, is

unsupported by any proof that he was so; nay, it is inconsistent with the fear he expressed in the act, that the minor might " be taken away by his relations." He cannot be presumed to have adopted the minor in the face of the prohibitory law, in regard to adoption.

The case of *Hopkins* v. *Buck* referred to slaves purchased by their father in Mississippi, and for years held by the minors. The facts of that case render it altogether inapplicable to this. It may well be contended that a father may make purchases of property in the name of his child, and that such titles will be valid. By our law, the father is the administrator of the estate of his minor children; nay, by the terms of Art. 1533 C. C., the parents of a minor are expressly permitted to accept a donation for him. But these provisions of the law, it is respectfully submitted, do not warrant strangers in disposing gratuitously of immovables and slaves to minors, in flagrant disregard of the prohibitory statutes and settled policy of our State.

The alleged renunciation of *Corri*, which has been referred to by the plaintiff, was passed upon in the case of *Haggerty* v. *Corri*, in 5 Annual Reports, to which the attention of the court is again called.

" The modifications of the right of property, under our laws, are few and easily understood, and answer all the purposes of reasonable use. It is incumbent on the courts to maintain them in their simplicity. A stronger case could not occur, than this, to show the dangers and evil consequences of giving effect, within our limits, to the complicated and involved jurisprudence upon which the title of plaintiff has been supported at bar." 2 Annual, 382.

There is no equity in this stale claim. The plaintiff has stood by too quiet and too long, seeing honest vendors transfer this property from one to another, when he might and should have spoken out and put them on their guard, if he had the latent rights he now asserts. *Wooters* v. *Feeny*, 12 An. 449.

BUCHANAN, J. The title under which plaintiff claims the slave *Absolom* alias *Henry*, is a sale to *William Charles Pope, Eliza Hight Pope*, and *John Haggerty*, and to the survivor of them, his or her heirs or assigns. The sale is made for the consideration or price of three hundred and fifty dollars cash, paid to the vendor by *William Charles Pope* and *Eliza Hight Pope*.

The two latter are proved to be dead, and *John Haggerty*, the other vendee, survives them, and is plaintiff in this suit. *Mr.* and *Mrs. Pope* left no forced heirs, and no creditors having an adverse interest to plaintiff's claim under the conveyance of the slave in question. His title has vested by the death of *Pope* and his wife, and by the fulfilment (which is proved) of another clause in the deed of sale, to wit, that plaintiff should continue to live with the two other vendees until their death.

The defendant and warrantors rely upon the prescription of five, ten and fifteen years. The two longest of these prescriptions are manifestly inadmissible, from the fact which the record establishes, that plaintiff attained the age of majority only seven years before the institution of this suit. C. C. 3488.

The plea of prescription of five years is based upon Article 3444 of the Code. But the defendant and warrantors have not brought themselves within that Article. The oldest title which they produce is the sale from *Henry Corri* to *David Kinney*, of the 17th of July, 1850, less than five years before the institution of this suit, February, 1855.

The only remaining question under the pleadings, relates to the liability of *Goold*, called in warranty by *Kinney*. We agree with the counsel of *Goold*, that this warranty was only conditional upon the insufficiency of the power of attorney from *Joseph Newton* to *Henry Levy*, to enable *Levy* to contract in the name of *Newton* the engagement of suretyship in the premises, by reason of the said power of attorney not being in an authentic form. No evidence or argument is before us, tending to establish the insufficiency of the power of attorney, and we conclude that the liability of *Goold* has not attached.

POPE
v
ANDERSON.

It is, therefore, adjudged and decreed, that the judgment of the District Court be reversed; that plaintiff, *John Haggerty Pope*, recover of defendant, *H. O. Anderson*, the slave *Absolom* alias *Henry*, described in the petition, with costs in both courts; that *H. O. Anderson* have judgment in warranty against *James White*, for the sum of eight hundred and fifty dollars and costs; that *James White* have judgment against *David Kinney*, in warranty for the sum of six hundred and fifty dollars and costs; that *David Kinney*, have judgment against *Henry Corri*, in warranty for the sum of seven hundred dollars, with costs; and that *Edmund L. Goold*, be hence dismissed, with his costs.

MERRICK, C. J., dissenting. I am not able to concur with my colleagues in this case. The instrument, the basis of this suit, is in these words, viz:

" Be it known, that on this twenty-fifth day of March in the year 1830, before me, *Hughes Pedesclaux*, Notary Public in and for the parish and city of New Orleans, duly commissioned, personally came and appeared, *Richard Walter Long*, of Tiffin county, of Tennessee, who declared, that in consideration of three hundred and fifty dollars cash to him paid by *William Charles Pope* and *Eliza Hight Pope*, of this city, the receipt thereof is hereby acknowledged and acquittance granted; he doth, by these presents, grant, bargain, sell, and deliver unto the said *William Charles Pope* and *Eliza Hight Pope*, his wife, and to *John Haggerty*, their adopted child, *and to the survivor of them*, his or her heirs and assigns, (the said party being present, acknowledging possession and accepting,) a negro name *Absolom*, aged about fourteen years, of a copper colored, or griffe, a slave for life, the property of the said *Richard Walter Long*, as set forth in the annexed certificate, obtained from the requisite authority in Tiffin county, Tennessee; which certificate the said *Richard W. Long* now produceth and deposeth on oath before me, Notary, is true and genuine in all respects, and that the slave now sold is the identical slave, is warranted to be free from the vices and malidies prescribed by law, and also free from all debts, liens, mortgages and incumbrances whatsoever, as appears by the register of mortgages for the city, dated this day.

To hold the said slave unto the said purchasers and *the survivor of them, their heirs* and assigns forever; and the said vendor hereby binds himself and his heirs, to warrant and defend the said slave, unto the said purchasers, their heirs and assigns, against the lawful claims of all persons whomsoever.

It is understood and agreed by and between all the said parties hereto, that if the said *John Haggerty* (who is an infant of about the age of two years) should happen to die or be taken away by his own relations, or go away, *or* of his own accord or otherwise, go away from the said *W. C. Pope* and *Eliza H. Pope*, his wife, at any time before the decease of the survivor of them, the said *W. C. Pope* and *Eliza H. Pope*, then and in such case said slave *Absolom* to go to the survivor of them, the said *W. C. Pope* and *Eliza H. Pope*, and the heirs of the survivor.

Done and passed in the presence of *William Rondeau* and *William Henry Rondeau*, witnesses, who hereunto sign their names with the said parties, and me, the Notary.         (Signed)                     RICHARD W. LONG,
                                                 WILLIAM C. POPE,
                                     for self and JOHN HAGGERTY.
                                                 ELIZA POPE.

W. RONDEAU.
W. H. RONDEAU.

                              H. PEDESCLAUX, Notary Public."

POPE
*v.*
ANDERSON.

If it be conceded that *John Haggerty*, the plaintiff, has shown a sufficient acceptance of the foregoing instrument, and that the condition mentioned in the act has been accomplished in his favor, there arises another difficulty in the way of his recovery. It is the stipulation of survivorship in the act. By the act, each joint tenant was bound to preserve for and return to the survivor one-third of the slave. If so, could any one of them defeat the rights of the others by a sale of his interest? Could he provoke a partition by licitation, and thus defeat the right of the survivorship altogether? Is not the kind of substitution and *fidei commissum* contained in the foregoing act prohibited by Art. 1507 of the Code? Can a person, through the machinery of a sale, accomplish what he could not do by a direct donation *inter vivos* or *mortis causa?* If the act of *sale* contains a disposition in contravention of Art. 1507, does it avoid the *entire act*, or will it be considered as containing a contract of sale as between the vendors and vendees, and a donation between the vendees themselves?

With my limited means of research, I am not able to solve these questions in favor of the plaintiff, the suit being a petitory action. Had the decree been for one undivided third of the slave, or had the plaintiff been in possession of the property, defending himself against other parties, after this long period of time, the question might have admitted, perhaps, of a different solution.